### TRIBUNE ASS'N v. FOLLWELL.

(Circuit Court of Appeals, Second Circuit. April 3, 1901.)

#### No. 100.

**1. LIBEL—EVIDENCE—RELEVANCY.**

Evidence of how many newspapers composed a press association from which defendant indirectly received a libelous dispatch which it published, where they were located, and to what ones the dispatch was sent, was irrelevant, there being no suggestion that defendant was one of them.

**2. SAME.**

Evidence that, prior to the date of a libelous dispatch published by defendant, none of the dispatches sent out during a witness' administration of a press association, of which he was superintendent, and from which the dispatch in question was indirectly sent to defendant, had been the basis of a libel, was properly excluded as immaterial and irrelevant.

**3. SAME—DEMAND FOR RETRACTION.**

Evidence that plaintiff had never demanded a retraction of such association was irrelevant.

**4. SAME—DEFENSE—PARTIAL SUPPRESSION OF LIBEL.**

That a part of a libelous story discreditable to plaintiff was suppressed is no excuse for defendant when sued for publishing the rest of it.

**5. SAME—CUMULATIVE EVIDENCE.**

Where, in an action for publishing a libelous dispatch, a witness concerned in its publication had already answered that he knew nothing at all about plaintiff, a question as to whether he knew of plaintiff's history in a place where he formerly resided was properly excluded.

**6. SAME.**

Where a witness who wrote a libelous article, for the publication of which action was brought, had already testified that trust in a reporter's accuracy made him accept the story, a question as to what were the grounds of his belief of the truth of the facts stated in the article might fairly have been excluded as cumulative.

**7. SAME.**

Where plaintiff, suing for libel, offered no evidence to support an unnecessary allegation of character and reputation, there was no error in excluding evidence intended to contradict such allegation.

**8. SAME—EVIDENCES OF OTHER OFFENSES NOT IMPUTED.**

It is no defense to a libel that plaintiff has been guilty of offenses other than those imputed to him, or of offenses of a similar character, and such facts are incompetent in mitigation of damages, their only tendency being to show, not that plaintiff's reputation was bad, but that it ought to be bad.

**9. SAME—WAIVER OF PART OF LIBEL—EFFECT.**

By plaintiff's waiver of so much of a libel sued for as charged his incompetency, defendant stood fully justified as to that part of the libel, and evidence to show incompetency was properly excluded.

**10. SAME—WITNESSES—CROSS-EXAMINATION—REFRESHING RECOLLECTION.**

A witness called by defendant in an action for libel charging plaintiff with robbing his employer represented plaintiff's employer during his employment, made his reports to him, saw the checks given to plaintiff, and audited statements made by plaintiff of his expenditures. With a book before him he was asked on cross-examination to refresh his recollection, and state what apparent balance, if any, plaintiff had in his hands, on a certain date, belonging to his employer. He answered that according to the book he had a balance which he specified. Thereupon motion was made to strike out the answer "on the ground that witness cannot refresh his recollection, as he says, 'according.'" *Held* that, the figures in the book being his own, made when he went over the accounts with plaintiff, and representing what he then believed was the correct balance, the answer was properly allowed to stand.

**11. SAME.**

Defendant was properly allowed to ask him on cross-examination whether he knew of a single dollar of his principal's money that plaintiff ever embezzled or stole.

**12. SAME—INTRODUCTION OF ACCOUNT BOOK—PRELIMINARY EVIDENCE.**

Plaintiff, suing for a libel charging him with robbing his employer, was properly allowed to state that certain check marks were made in the presence of his wife and himself in a book kept by him, when the items so checked came back to him with the signature of his employer's representative, with whom all the business in question was transacted, saying they were all right, such testimony being preliminary to the offer of the book in evidence.

**13. SAME—INSTRUCTIONS.**

A charge stated that in one of the paragraphs of the answer defendant averred that each one of the defamatory statements in the publication complained of was and is true in substance, and that it had assumed responsibility for the libel. *Held*, that it could not complain thereof, as its answer avers that "each and every defamatory statement in the publication is and was true, in substance, as follows," and then sets forth several instances in which it alleged that plaintiff charged for and collected more money from his employer than he actually disbursed.

14. SAME.

 An instruction stated that "the defendant was not guilty of personal ill-will to the plaintiff, for it did not and had not previously heard of him, but it is said that its conduct in publishing the libel without mitigation and without an attempt to discover whether it was true or false was wanton and reckless, and is equivalent to actual malice." *Held*, that an exception to such passage was without merit.

15. TRIAL—INSTRUCTIONS—REPETITION IN DIFFERENT FORM.

 No error can be predicated on a refusal to restate in another form a portion of the charge which correctly and sufficiently stated the proposition requested.

16. LIBEL BY CORPORATION—RATIFICATION—FINDING.

 That a defendant corporation's answer in an action for libel reiterated, in substance, the defamation, was sufficient to sustain a finding of subsequent ratification of the publication, which would warrant the jury in considering the circumstances under which it was published, and holding it equally liable for any recklessness or wantonness in the publication as if it had originally authorized it.

In Error to the Circuit Court of the United States for the Southern District of New York.

This is a writ of error to review a judgment entered upon a verdict for $5,000 in favor of the defendant in error, who was plaintiff below. The libel appeared April 6, 1895, in the New York Tribune, a newspaper published by the plaintiff in error, who was defendant below. It reads as follows:

"Anson Phelps Stokes Robbed.

"His Former Head Gardener at Lenox Got Away with $6,000 or $7,000.

"Pittsfield, Mass., April 5th. A sensation was caused here and in Lenox today by the disclosure that Frederick S. Follwell, until recently head gardener for Anson Phelps Stokes at the latter's magnificent place in Lenox, was a defaulter to the amount of $6,000 or $7,000. Several months ago Mrs. Stokes, who is an enthusiastic botanist, discovered that Follwell's knowledge of the subject was superficial, and had him discharged. He was engaged to go to Pierre Lorillard's place at Newport. Soon after his departure, Mr. Stokes began to receive bills for which he had already given checks. An investigation showed that Follwell had incurred many bills in his employer's name, and had appropriated checks given to him with which to pay them. When the shortage was discovered, word was sent to Newport with the idea of having Follwell come here and explain, but he was not there, and had not been since he left Lenox, and no trace of him has been found. His wife and child are in this city."

Henry W. Sackett, for plaintiff in error.
Wm. L. Snyder, for defendant in error.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge (after stating the facts as above). There are 97 assignments of error, which may be best discussed within the limits of an opinion by classifying them into certain broad groups, and disposing of the questions which therein arise. This method has been followed in the briefs and argument, but the classification there adhered to may be somewhat modified.

1. Extent and sources of information and grounds of belief: Error is assigned in that the court sustained objections to certain questions put to the witnesses Lyon and Fletcher, and excluded a printed paper marked "Exhibit E." The brief of plaintiff in error discusses at great

length the authorities bearing upon the question to what extent a defendant in an action for defamation of character may give proof of the information of which he was possessed when he spoke, wrote, or published; what were the sources of such information; whether he believed his statement to be true; and the grounds of such belief. It will be unnecessary to follow out the elaborate and exhaustive discussion of this subject on authority and precedent. It is thought that a careful history of the libel will make it apparent that the particular exceptions grouped under these assignments of error are without merit. The person who originated the story, so far back as it can be traced, was John C. Lamb, chief reporter on the staff of S. Chester Lyon, who was editor of the Evening Eagle of Pittsfield, Mass., and representative in Central Berkshire of the New England Associated Press. Lamb called Lyon's attention to the subject, and was thereupon directed to make an investigation. Shortly thereafter Lamb made a report to Lyon in form ready for publication. Lyon printed Lamb's report in his paper. He also wrote out a paraphrase of it, which is substantially the same, except that it omitted a statement that Follwell was obliged to leave England on account of money troubles, and that at the time of his departure ugly rumors were in circulation concerning him. Lyon sent his paraphrase of Lamb's report by telegraph to the New England Associated Press. This was an association of newspapers for the collection of news for mutual benefit. Its principal place of business was in Boston. Apparently, the Tribune was not a member of it; no offer to prove such membership was made. The superintendent of the New England Associated Press received Lyon's story, and sent it to another concern known as the United Press. George N. Smith, telegraph editor of the defendant, received a telegram from the United Press containing the same story between 11 and 12 o'clock the night of April 5, 1895. He read it, wrote a head for it, marked the type on it, and sent it to the composing room. It was published in the paper of April 6th, which went to press about 2 a. m. He made no effort to verify it. The paper had no special reporter at Pittsfield. It did have one at Newport, R. I., where, as the libel states, plaintiff was engaged to go. Inquiry there at Mr. Lorillard's would have found him. There was not time to communicate with Newport and get a reply in time for publication in the next day's paper. Had he waited over another day, the article would have ceased to be of any value as news. Apparently, no objection was interposed to any questions put to Smith. He testified that he had no knowledge whatsoever in reference to the plaintiff; had received no information or reason to doubt the accuracy of the dispatch; that he had experience with United Press dispatches, and with regard to their accuracy never had any troubles, except in the case of this dispatch; that he did not know anything special about the care which they took in preparing their dispatches, or their methods,— simply that they furnished news to the papers witness had been employed by, and that their news was found to be correct; that he supposed this article was true. Fletcher, superintendent of the New England Associated Press, testified that Lyon had been representative of the concern in Pittsfield and vicinity for about five years, and had

conducted himself so as to inspire the utmost confidence; that his trustworthiness as a reporter of news was at the time unquestioned; that witness did not know plaintiff, had no animosity or malice, and at the time he sent the dispatch believed it to be true. He testified to the care used in selecting correspondents of good character and first-class standing, and in training or instructing them. He was not allowed to testify how many newspapers composed his association, and where they were located, and to what newspapers he sent the dispatch. There being no suggestion that defendant was one of them, the evidence sought to be elicited was manifestly irrelevant. Nor was he allowed to testify that prior to April 5, 1895, none of the dispatches sent out during his administration had been the basis of an action for libel; nor that plaintiff had ever demanded a retraction. Such testimony was properly excluded as immaterial and irrelevant. Lyon testified that, to the best of his knowledge, Lamb had been in the newspaper business six years, and about four months with the witness, who trusted his reports entirely; that he had known his connection and his work in other capacities, so that he had every reason to trust him. Lamb was dead, and therefore no evidence could be offered as to what investigation he made, what information he had, what were the sources thereof, what he believed, and what were the grounds of his belief. The court excluded the printed copy of the report of Lamb as printed in the Pittsfield paper (Exhibit E). The record already showed that the entire story which Lyon sent to the New England Associated Press was taken from the report made to him by Lamb, and that his sole source of information was Lamb. That, in addition to the story forwarded and ultimately published in the Tribune, Lamb told him that plaintiff was obliged to leave England on account of money troubles, and that there were ugly rumors in circulation concerning him, was wholly immaterial. Lyon had no connection whatever with the Tribune, and the fact that he suppressed a part of a story discreditable to plaintiff is no excuse for the defendant when sued for publishing the rest of it.

The other exceptions relied on are to the exclusion of two questions. The first is: "Did you, at the time you wrote the article which you hold in your hand, and as published in the Tribune, know of Mr. Follwell's history in England?" This was manifestly improper, for the witness testified that he knew nothing at all about the plaintiff; Lamb's story being all he had heard. The other question is: "What were the grounds of your belief of the truth of the facts stated in the article which you say you had written for the Tribune?" This might fairly have been excluded as cumulative, for he had already testified that his trust in Lamb's accuracy made him accept his story; and in the discussion which followed the objection to this last question he again testified that the sources of his information did not lie outside of his own staff, and were mere rumors. The plaintiff in error argues at great length that in libel suits the newspaper should be allowed to show with what care its agencies for gathering news are conducted, and anything which may throw light upon their trustworthiness. In the case at bar, defendant was allowed to go into all such

details as fully as it chose, except as above indicated, and certainly has been denied no proper opportunity to show what measure of care it took.

2. Other and different offenses: It is contended that the court erred in excluding evidence of what plaintiff had done in England. What defendant sought to prove was that while a member of a partnership, and during the illness of his partner, he collected £200 from debtors of the firm, appropriated it to his own use, and left the country, the firm being made bankrupt thereby. It is made a felony by statute for a bankrupt to quit England with £20 of property which should be divided among creditors, if he does so with intent to defraud. An attempt was also made to show that he shamefully abused his first wife in England, and left her destitute. It was sought to sustain the introduction of such evidence on these grounds: (a) That it was competent under one of the issues raised by the pleadings. The complaint averred that plaintiff had been engaged for many years in business of great trust and responsibility, and had so conducted himself and his said business that at the time of the acts hereinafter set forth he had enjoyed a good name and reputation, and a character and credit among all people for the faithful performance of all his duties. These averments are specifically denied by the answer. (b) In mitigation of damages, in disproof of damages, in disproof of malice, as facts of which the writer of the article had information at the time of writing and transmitting that article. (c) As competent in reduction of damages under section 536 of the Code of Civil Procedure. (d) As competent in mitigation as giving color to the charge of dishonesty in the Tribune article, by way of modification. The first of these grounds is insufficient for the reason that plaintiff introduced no testimony in support of these unnecessary averments. None of the authorities cited on the brief sustain defendant's contention. In Stafford v. Association, 142 N. Y. 598, 37 N. E. 625, the plaintiff called witnesses to support similar allegations, similarly denied, and defendant objected to their testifying. The objection was held unsound on the ground that defendant had opened the door by denying the unnecessary allegation. The situation is very different where plaintiff closes his case with no offer of evidence in support of such unnecessary allegations. Keegan v. Sage, 31 Abb. N. C. 54, 25 N. Y. Supp. 78, McIntyre v. Ogden, 17 Hun, 604, and Dovan v. Dinsmore, 33 Barb. 86, are all decisions on motions to reform the pleadings. As to the second ground, it is clear from the evidence that, of the "facts" sought to be proved in mitigation of damages, no one in the Tribune Association, nor any one connected with it or in its employ, had any information whatever. Touching the third and fourth grounds, it is sufficient to refer to the former decision of this court in Association v. Schenck, 40 C. C. A. 163, 98 Fed. 925, where the whole subject was considered, and it was held:

"It is not a defense to a libel or slander that the plaintiff has been guilty of offenses other than those imputed to him, or of offenses of a similar character; and such facts are not competent in mitigation of damages. The only tendency of such proof is to show, not that the plaintiff's reputation is bad, but that it ought to be bad."

The same principle covers exceptions to the exclusion of evidence tending to show that plaintiff had solicited or received commissions from tradesmen upon bills of goods bought for Mr. Stokes, and that he had solicited another employé to unite with him in the claim that they were both engaged under a contract by which they were to have six months' notice of discharge.

3. As to the charge of incompetency: The article in the Tribune charged that plaintiff's knowledge of botany was superficial. If false, this was libelous, and the answer contains many averments, which, if proved, would justify the charge. When the case came on for trial, defendant, which had denied publication and circulation, made sufficient admissions to relieve the plaintiff from making proof thereof, and "plaintiff thereupon waived the alleged libel of superficial knowledge of botany." Under these circumstances, we do not think it was error to exclude testimony of mismanagement of rosebushes and of ferns. By plaintiff's "waiver," defendant stood fully justified as to that part of the libel, and no evidence was needed to show that for such publication plaintiff had no ground of complaint against it.

4. Some minor matters of evidence: One of the witnesses, James W. McCulloch, called by defendant, represented plaintiff's employer during all the time of his employment. Plaintiff made his reports to him, he saw the checks given to the plaintiff, and went over and audited the statements made by plaintiff of his expenditures. On cross-examination he testified that the statements were in court, produced one, and testified without objection that it covered the month of February, and showed a certain balance. He was then asked: "Q. Is that statement that you have there an exact copy of the account which you see on page 3 of this book?" This was objected to on the ground that the book was not in evidence, and exception reserved; but, so far as the record shows, the question was never answered. The same witness, with a book (Exhibit 5 for identification) before him, was asked to refresh his recollection, and state what balance, if any, plaintiff had in his hands on a certain date belonging to his employer,— what apparent balance. His answer was, "According to the book, he had an apparent balance of about twenty-odd dollars." This was objected to, and motion made to strike out the answer, on the ground that witness cannot refresh his recollection, as he says, "according." It appears, however, that the figures in the book to which he testified were his own, made in pencil at the time he was going over the accounts with plaintiff as the representative of Mr. Stokes, and represented what he then believed was the correct balance. This relieves the testimony from the sting of the particular objection recorded. We see no impropriety in asking, on cross-examination of this particular witness, the man who, of all others, was the most likely to know, whether he knew of a single dollar of Mr. Stokes' money that plaintiff ever embezzled or stole. There was no error in allowing plaintiff to state that certain check marks were made in a book kept by him, in the presence of his wife and himself, when the items so checked came back to him with Mr. McCulloch's signature saying they were all right. The testimony was preliminary to the offer of the book. Plaintiff was entitled to show, and indeed ought to have shown, what the book

purported to be, and how it was kept, before offering it. Had it been admitted after this testimony was given as to the check marks, there might be force to the objection that plaintiff could not use his own books of account kept by himself to bolster up his own testimony. But the book was not admitted in evidence, nor even offered, so far as we can find. The exception to the question is unsound.

5. The charge: Error is assigned to four passages in the charge. The first two of these are:

"It is not a defense to a libel that the plaintiff has been guilty of offenses other than those imputed to him, or of offenses of a similar character."

"Proof of the bad character of the plaintiff is competent because one whose character is bad is not entitled to the same measurement of damages as one of unblemished fame. This does not mean proof of particular offenses of a similar character to those which are imputed to him in the libel, but proof of general bad character."

This subject has already been discussed. The charge is in conformity to the opinion of this court in Association v. Schenck, supra. The next passage complained of is as follows:

"In one of the paragraphs of the answer it [the defendant] averred that each one of the defamatory statements in the publication complained of was and is true, and has assumed responsibility for the libel."

When attention was called to this, the court qualified it by adding the words "in substance." The answer avers that "each and every defamatory statement in the publication is and was true, in substance, as follows," and then sets forth several instances in which it alleged that plaintiff charged for and collected more money than he actually disbursed. The charge in this particular was undoubtedly sound. The next passage excepted to is as follows:

"The defendant was not guilty of personal ill-will to the plaintiff, for it did not know and had not previously heard of him, but it is said that its conduct in publishing the libel without investigation, and without an attempt to discover whether it was true or false, was wanton and reckless, and is equivalent to actual malice."

It is difficult to understand upon what theory it could be contended that there was any error in this statement. Error is finally assigned for a refusal to charge the proposition:

"Affirmative proof of guilty intention or actual malice on the part of the defendant is required to sustain punitive damages. Absence of proof of defendant's bad motive cannot take the place of affirmative evidence."

In addition to the passages already quoted, the court charged:

"If a person, in publishing a libel of a serious character against an individual, is affirmatively shown to have been guilty of recklessness or wantonness, neither knowing whether it was true or false, or not, nor making any adequate attempt to discover whether it was well founded or not, such wantonness of conduct is justly regarded as actually malicious in its character."

And also:

"Inasmuch as the defendant is a corporation, it cannot be found actuated by malice if it did not authorize the article, or did not ratify it after it was published, because the corporation is not responsible for the actual malice of its employés, if it neither authorized the particular article nor subsequently ratified its publication."

And then follows the passage above quoted, touching the averments of the answer. This was a correct and sufficient statement. Defendant was not entitled to have part of it restated in another form to comply with the request. Irrespective of any question whether the answer was interposed in bad faith or not (which might, if the jury so found, warrant punitive damages), the fact that the answer in substance reiterated the defamatory statements was quite sufficient to sustain the finding of a subsequent ratification of the publication, which would warrant the jury in considering the circumstances under which it was published, and holding the corporation liable for any recklessness or wantonness in such publication as if it had originally authorized it. The judgment is affirmed.